IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LACEY C. LYBARGER, | CASE NO. 3:24-cv-1013 |
| Plaintiff, | |
| | DISTRICT JUDGE |
| | JEFFREY J. HELMICK |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Lacey Lybarger filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In November 2020, Lybarger filed an application for Disability Insurance Benefits alleging a disability onset date of August 27, 2020,[1] and claiming she was disabled due to trigeminal neuralgia, migraines and

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

allodynia, fibromyalgia, vertigo, dizziness, anxiety, temporomandibular joint (TMJ) disorder, thoracic outlet syndrome, bulging discs, and Graves' disease. Tr. 364, 386. The Social Security Administration denied Lybarger's application and her motion for reconsideration. Tr. 244, 257. Lybarger then requested a hearing before an Administrative Law Judge (ALJ). Tr. 286.

In March 2023, an ALJ held a hearing. Lybarger and a vocational expert testified. Tr. 186–225. In August 2023, the ALJ issued a written decision finding that Lybarger was not disabled. Tr. 18–42. The ALJ's decision became final on April 11, 2024, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Lybarger filed this action on June 14, 2024. Doc. 1. She asserts the following assignment of error:

> Whether the ALJ's finding that Plaintiff's severe migraines and the resulting symptoms and functional limitations therefrom did not medically equal Listing 11.02 was supported by substantial evidence.

Doc. 6, at 13.

## Evidence

### *Personal and vocational evidence*

Lybarger was born in 1983 and was 37 years old on her alleged disability onset date. Tr. 40. She used to work as a bookkeeper and tax preparer and last worked in August 2020. Tr. 216, 386–87.

2

*Relevant medical evidence*

In December 2019, Lybarger had a neurology follow-up for left-sided trigeminal neuralgia[2] and migraines with Certified Physician Assistant Anthony Hamilton. Tr. 557.  Lybarger reported that she "continue[d] to suffer from frequent migraine[s]" and averaged 15 days of migraines a month. Tr. 557. Some migraines were "debilitating and others she c[ould] push through, each with migrainous features of pounding quality head pain, photophobia, and phonophobia." Tr. 557. Lybarger had tried several migraine medications without success. Tr. 558. Her physical exam findings were normal. Tr. 558. Hamilton assessed chronic migraine, trigeminal neuralgia, and fibromyalgia, and prescribed Emgality injections for migraines. Tr. 558.

In May 2020, Lybarger told Hamilton that during the first three months that she received Emgality injections, she had no more than one headache a month. Tr. 554. But then Lybarger started having headaches once a week, and by May she experienced headaches about five times a week. Tr. 554.

In July 2020, Lybarger told Hamilton that Emgality no longer improved her migraines. Tr. 551. Hamilton assessed Lybarger with migraine without aura, trigeminal neuralgia, bruxism (teeth-gnashing or clenching), and

---

[2]     "Trigeminal neuralgia is a condition characterized by pain coming from the trigeminal nerve, which starts near the top of the ear and splits in three, toward the eye, cheek and jaw." *See Trigeminal Neuralgia*, John Hopkins Medicine,          https://www.hopkinsmedicine.org/health/conditions-and-diseases/trigeminal-neuralgia#:~:text=Trigeminal%20neuralgia%20is%20a%20condition,commonly%20affects%20only%20one%20side [https://perma.cc/6FNL-YNZZ].

dizziness. Tr. 552. He administered a Toradol injection and prescribed Topamax. Tr. 552.

In August 2020, Lybarger was evaluated for physical therapy for her trigeminal neuralgia, temporomandibular joint dysfunction, and left arm and neck pain. Tr. 530. She reported having headaches "almost all the time." Tr. 533.

In early September 2020, Lybarger went to the emergency room. Tr. 630. She reported that she had a history of trigeminal neuralgia and chronic left-sided headaches for two years. Tr. 630. She "recently" changed headache medication and "has now been having [headaches] for [the] past month," which had worsened two to three days before her emergency visit. Tr. 630.  Lybarger rated her pain a 10 out of 10, and said that it was exacerbated by light, noise, opening and closing her mouth, and chewing. Tr. 630. Avoiding light and noise alleviated her pain. Tr. 630. She cited auras as a preceding headache symptom and listed associated symptoms of nausea, photophobia, and neck pain. Tr. 630. Lybarger's exam findings showed that she was alert, cooperative, and fully oriented, with normal speech, coordination, sensation, and motor functioning. Tr. 634. The doctor diagnosed Lybarger with a migraine and treated her with intravenous saline and medication. Tr. 635. Lybarger's symptoms improved, and she was discharged. Tr. 635.

About a week later, Lybarger saw Hamilton and he administered an occipital nerve block. Tr. 516.

4

In early October 2020, Lybarger attended a physical therapy evaluation for her migraines, trigeminal neuralgia, fibromyalgia, and bruxism. Tr. 496. She reported daily headaches that varied in intensity. Tr. 497.

On October 22, Lybarger followed up with Hamilton in neurology. Tr. 482. She reported that the occipital nerve block had not helped. Tr. 482. Two weeks before the visit, Lybarger began titrating the Topamax medication and it had helped—her migraines decreased from 15 per month to 5 per month. Tr. 748. She still had "some form of daily headache." Tr. 748. Lybarger's exam findings that day were normal. Tr. 750. Hamilton adjusted Lybarger's medications—he continued Topamax, Lamictal, and Vitamin B2; increased Amitriptyline; added Maxalt; and administered a Toradol injection. Tr. 750.

On October 28, Lybarger saw pain management doctor Ryan Szepiela, M.D. Tr. 478. Lybarger reported pain in her left arm. Tr. 478. She was taking her medications, including Norco and Topamax, which helped her pain. Tr. 479, 481. Lybarger's exam findings showed myofascial pain. Tr. 480. Dr. Szepiela assessed Lybarger with fibromyalgia, chronic pain syndrome, and muscle spasm and advised that Lybarger continue with her current treatment. Tr. 480.

On December 4, 2020, Lybarger followed up with Hamilton in neurology and reported left-sided face pain for over one week. Tr. 752. The pain adversely affected her sleep, emotional status, and daily activities. Tr. 752. Lybarger's exam findings were normal. Tr. 754. Hamilton assessed Lybarger with

trigeminal neuralgia, currently intractable; chronic migraine; and fibromyalgia. Tr. 755. He wrote that he "[w]anted to have her directly admitted to the hospital for IV medication" but that it wasn't permitted due to Covid-19 policies. Tr. 755. Hamilton administered a Toradol injection and added the medication Phenytoin. Tr. 755.

On December 10, Lybarger had a physical therapy appointment and reported severe pain in her forehead, running down the middle of her face and into her teeth. Tr. 1083. She also had pain in her neck, shoulders, and upper and lower back. Tr. 1083. Her pain slightly improved after therapy. Tr. 1084.

The next day, Lybarger went to the emergency room complaining of left-sided face pain and a headache. Tr. 1166. An emergency room exam showed that Lybarger was in mild, acute distress due to pain and had an increased heartrate. Tr. 1167. The doctor diagnosed left-sided trigeminal neuralgia. Tr. 1169. He administered a "migraine cocktail … because she did have a migraine as well." Tr. 1168. He noted that Lybarger was on "multiple medications for neuralgia without any improvement," consulted with neurology, and admitted her to the hospital for trigeminal neuralgia management. Tr. 1168–69, 1190. During Lybarger's hospitalization, she received intravenous treatments. Tr. 1322. Lybarger was discharged five days later with medication adjustments, including an increased Topamax dosage. Tr. 1322.

On December 21, five days after her hospital discharge, Lybarger saw Dr. Szepiela for pain management. Tr. 1163. Lybarger complained of pain

6

when she ate, mostly on the left side of her face and with her teeth. Tr. 1163. Lybarger's exam findings showed "[l]eft-sided facial pain distribution into the forehead[,] face and jaw area," "difficulty with chewing movement of the jaw" and overall range of motion, and "diminished sensation in the left side of the cheek and surrounding area." Tr. 1164. Dr. Szepiela assessed trigeminal neuralgia, muscle spasm, and chronic pain syndrome. Tr. 1165. He commented that Lybarger would try the medication Lyrica, and he discussed with her Botox injections in the temporomandibular joint and trigeminal nerve area. Tr. 1165. He also referred Lybarger to the trigeminal neuralgia center at the Cleveland Clinic for evaluation. Tr. 1165.

In mid-January 2021, Lybarger saw Hamilton in neurology for a follow-up visit. Tr. 1161. Lybarger stated that Lyrica made her sleepy and that it had not improved her face pain. Tr. 1161. Her exam findings were normal. Tr. 1162–63. Hamilton assessed Lybarger with trigeminal neuralgia and chronic migraine. Tr. 1163. He administered a Toradol injection and discontinued the daytime Lyrica dose. Tr. 1163.

The next day, Hamilton completed a "Headache Residual Functional Capacity" form on Lybarger's behalf. Tr. 1410–12. Hamilton stated that he began treating Lybarger in March 2019 for left-sided trigeminal neuralgia and migraines. Tr. 1410. Her prognosis was guarded. Tr. 1410. He characterized Lybarger's headaches as "[l]eft hemi-cephalic, moderate to severe intensity." Tr. 1410. He listed Lybarger's associated symptoms as vertigo, nausea and

7

vomiting, malaise, photosensitivity, inability to concentrate, and impaired sleep. Tr. 1410. Hamilton wrote that Lybarger experienced 20 to 25 migraine headache days per month and that the headaches lasted between 12 to 24 hours. Tr. 1410. Her headache triggers were bright lights, noise, strong odors, stress, and weather changes. Tr. 1410. Medication, dark rooms, and a quiet place helped Lybarger's headaches. Tr. 1410. When asked to identify "positive test results and objective signs" of Lybarger's headaches, Hamilton checked boxes indicating "tenderness" and "impaired sleep." Tr. 1411. He opined that Lybarger's headaches could be caused by migraines or left trigeminal neuralgia. Tr. 1411. He listed Lybarger's current medications: Amitriptyline, Topiramate (Topamax), Lamotrigine, Vitamin B2, Rizatriptan (Maxalt), and Zofran. Tr. 1411.

Hamilton opined that when Lybarger had a headache, she would "generally be precluded from performing even basic work activities and would need a break from the workplace." Tr. 1411. As a result of her impairments or treatment, Lybarger would be absent from work more than four days per month. Tr. 1411. She would need unscheduled breaks, but Hamilton was "unclear" how often this would occur. Tr. 1411. In answer to a question asking whether these limitations applied since August 27, 2020, Hamilton answered "yes." Tr. 1412.

In late January 2021, Lybarger saw Dr. Szepiela for continuing temporomandibular joint pain. Tr. 1158–59. Lybarger said that Lyrica helped

her sleep but was making her too drowsy during the day. Tr. 1159. An exam showed that Lybarger had left-sided face pain and diminished range of motion in the left side of her neck. Tr. 1160. Dr. Szepiela assessed Lybarger with left-sided trigeminal neuralgia, fibromyalgia, and chronic migraines. Tr. 1160. He indicated that he would wait before increasing the Lyrica dose to see if Lybarger got used to the drowsiness. Tr. 1160. He also referenced awaiting further input from Lybarger's upcoming Cleveland Clinic trigeminal neuralgia appointment. Tr. 1160.

The next day, Lybarger saw Jennifer Kriegler, M.D., by video for a "Headache Center New Face Pain Evaluation" at the Cleveland Clinic. Tr. 1416. Lybarger recited her history of face pain and listed her "facial pain features." Tr. 1417. She also reported her "headache features," including light, noise sensitivity, vertigo, unsteadiness, nausea, and vomiting. Tr. 1417. She reported having had migraines for many years, and currently experiencing headaches more than 15 days a month. Tr. 1417. Her headaches were "currently side locked," but in the past had been right- or left-sided. Tr. 1417. Lybarger said that she had tried "multiple treatments including Emgality[,] which helped for a while, but lost its effectiveness." Tr. 1417. Dr. Kriegler observed that Lybarger was alert and oriented, answered questions in an appropriate manner, and made eye contact without apparent pain behavior. Tr. 1421. She diagnosed Lybarger with intractable chronic migraine headaches and left-sided trigeminal neuralgia. Tr. 1421. She stated that she would start

9

an indomethacin trial "to see if a component of her headache is [hemicrania continua]"—a primary headache disorder not caused by another medical condition—and would seek insurance certification for Botox. Tr. 1421. She wrote:

> This patient meets FDA criteria for Chronic Migraine Headache (CM), Chronic Migraine without aura, with mention of intractable migraine, so stated, without mention of status migrainosus which is headache that occurs at least 15 days per month for at least 4 hours per day. The only FDA approved medication for CM is Botox. Specifically, she has 30 headaches per month, lasting 4 or more hours/d[ay] associated with photophobia, phonophobia, nausea, vomiting, vertigo, lightheaded. Her disability is high: she is unable to work and is currently receiving disability. She has had multiple Emergency department/Urgent Care visits in the last year.

Tr. 1421. Dr. Kriegler listed preventative medications that Lybarger had tried without benefit, including Topamax, Lyrica, Amitriptyline, Emgality, and nerve blocks. Tr 1421. She also commented that other medications that Lybarger had tried, such as Maxalt, "require high frequency use which can lead to Medication Overuse Headache." Tr. 1421.

Three days later, Lybarger called Hamilton's office and said that she believed she was experiencing side effects from Topamax—finger-nail pain, some hair loss, lower back pain, and abnormal menstrual bleeding. Tr. 1157. She had decreased the Topamax dosage to once a day, which, Lybarger stated, they had discussed at her last appointment. Tr. 1158. Hamilton responded that it was "ok to decrease the Topamax." Tr. 1158.

In March 2021, neurologist Pamela New, M.D., reviewed Lybarger's medical history at the behest of Lybarger's long-term disability carrier. Tr. 972–79. Dr. New opined that Lybarger could not have worked from December 11 to 16, 2020, because she was hospitalized. Tr. 978. Dr. New determined that, otherwise, from September 1, 2020 to March 2, 2021, Lybarger had the following work restrictions: she could sit for two hours at a time, for eight hours total per day. Tr. 978. She could sit or work at a computer for 30 minutes at a time, for eight hours total per day, and stand for one hour at one time, for eight hours total per day. Tr. 978. Lybarger could occasionally lift, carry, push, and pull ten pounds. Tr. 978. She could never climb, crawl, kneel, stoop, bend, reach above shoulder level or below waist level, or work in bright lights, loud noise, or among strong odors. Tr. 978. Dr. New advised that Lybarger's treatment was consistent with the standard of care for her conditions and that the record did not contain evidence of treatment non-compliance. Tr. 979.

In April 2021, Lybarger followed up with Hamilton. Tr. 1154–55. She reported improvement from Lyrica; her trigeminal neuralgia break-through pain was less severe and more manageable. Tr. 1155. Hamilton administered a Toradol injection and slowly increased the Lyrica dosage. Tr. 1156. He advised Lybarger to wean off Topamax, stating that doing so may "help improve some of her 'brain fog' and intermittent word finding difficulty." Tr. 1156.

In late April 2021, Lybarger saw Dr. Szepiela for a medication check-up for trigeminal neuralgia and fibromyalgia. Tr. 1152. Lybarger reported that she was taking Norco for pain "with good relief." Tr. 1152. That day, Lybarger rated her pain an eight out of ten. Tr. 1152. She hadn't been "moving much" or "doing much of her activities" due to pain from the Covid vaccine that had elevated her fibromyalgia and temporomandibular joint pain. Tr. 1152. Dr. Szepiela assessed fibromyalgia, gait abnormality, and muscle spasm. Tr. 1153–54. He remarked that Lybarger was undergoing medication changes and recommended that she start doing light exercises and activities to help with fibromyalgia. Tr. 1154.

In June 2021, Lybarger returned to Dr. Szepiela. Tr. 1149. She reported increased fibromyalgia pain, worse in her hips and lower back. Tr. 1149. She was unsure how the Lyrica was helping. Tr. 1149. She reported that she "just came off of medication," Tr. 1149, which appears to refer to Topamax, Tr. 1147, and reported worsening headaches and worsening migraines, Tr. 1149. She rated her pain an eight out of ten. Tr. 1149. Lybarger's exam findings showed pain, spasms, and decreased range of motion in her lower back. Tr. 1150. Dr. Szepiela assessed Lybarger with lumbar degenerative disc disease, fibromyalgia, and chronic pain syndrome. Tr. 1151. He wrote that Lybarger would discuss medication adjustments with neurology at her appointment the same day, and "mention[ed] the possibility of a short steroid taper for the acute inflammation and diffuse pains that she is having and will keep this in mind

as a treatment option." Tr. 1151. Lybarger was to "continue to stay active …
with her exercises." Tr. 1151.

Later that day, Lybarger saw Hamilton for a follow-up visit. Tr. 1146–
47. Lybarger reported that she had weaned off Topamax about a week before
the appointment, and that during the intervening week she had a "persistent
left side [headache]." Tr. 1147. The left side of her face felt raw, and she was
afraid to eat most of the day because she feared exacerbating her trigeminal
nerve pain. Tr. 1147. She also reported feeling tired and sleepy during the day
and experiencing increased pain throughout her body "over the last few days."
Tr. 1147. Hamilton administered a Toradol injection and restarted Topamax.
Tr. 1148. He commented that Lybarger was unlikely to tolerate an increased
Lyrica dose and advised that communication with Dr. Szepiela should ensue
regarding Lybarger's medication regimen. Tr. 1148.

In mid-August 2021, Lybarger saw a psychologist for a psychological
consultative evaluation. Tr. 1465. Lybarger said that she lived with her
boyfriend and her father. Tr. 1465. She had a driver's license and could drive.
Tr. 1466. Lybarger said that her boyfriend performed household chores and
grocery shopping and that he and Lybarger's father managed the household
finances. Tr. 1466. Lybarger reported that she had no set routine and spent "a
lot of time in bed … and watched 'a lot' of television." Tr. 1466. The doctor
described Lybarger as cooperative and friendly with easily established and
maintained rapport. Tr. 1466.

13

A week later, Lybarger saw Dr. Szepiela. Tr. 1143. She reported increased nerve pain in her face and teeth, which caused more migraines and made it difficult for her to eat. Tr. 1144. Her pain medicine was not working as well and she had not been as active as she liked. Tr. 1144. Lybarger's exam finding showed temporomandibular joint pain to palpation and difficulty with jaw range of motion. Tr. 1145. Dr. Szepiela assessed arthralgia of the left temporomandibular joint, left-sided trigeminal neuralgia, fibromyalgia, and chronic temporomandibular joint pain. Tr. 1146. He ordered a temporomandibular joint MRI. Tr. 1146.

In mid-September 2021, Lybarger saw Dr. Szepiela for pain in the left side of her face, facial nerve, neck, and temporomandibular joint. Tr. 1140. Lybarger's exam findings showed that she had left-sided face and temporomandibular pain and difficulty with range of motion in her temporomandibular joint and the left side of her neck. Tr. 1142. Dr. Szepiela reviewed Lybarger's MRI results, which showed mild degeneration of both articular discs in Lybarger's temporomandibular joint with no abnormal dislocation or subluxation of the disc. Tr. 1142. He assessed Lybarger with chronic pain syndrome, left-sided trigeminal neuralgia, chronic migraine, and fibromyalgia. Tr. 1142. He increased Lyrica since Lybarger was "tolerating the Lyrica dosing." Tr. 1142.

Five days later, Lybarger followed up with Hamilton and reported that her migraines improved somewhat after restarting Topamax. Tr. 1138. She

14

tolerated it well if she took it in the morning rather than at night. Tr. 1138. Lybarger described trigeminal neuralgia pain around her left ear and left temple, which radiated throughout the rest of the left side of her head. Tr. 1138. Hamilton commented that this area "is in the distribution of the Left Auriculotemporal Nerve, which is a branch of the Mandibular Nerve." Tr. 1138. Hamilton suggested Lybarger have auriculotemporal and mandibular nerve blocks, which Lybarger said she would consider. Tr. 1139. He continued her other medications and increased the night-time Lyrica dose. Tr. 1139.

In November 2021, Lybarger, on referral from Hamilton, saw neurologist Selena Nicholas-Bublick, M.D., to discuss potential nerve blocks and Botox injections. Tr. 1526. Lybarger reported experiencing headache pain every day of the month that presented in three forms:

> The first type is located on the left forehead about her left eye that can radiate to the left temple and left occipital region. This pain is rated at an average of 6/10 on a pain scale. It is described as feeling like a "bruise". There is nausea with occasional vomiting, light sound and smell sensitivity with worsening during normal routine activity.
>
> The second type occurs approximately 15 days out of the month. This pain is similar in location to the above head pain but is more intense with a rating of 10/10, and throbbing intense pressure. She has to lay in a quite dark room as a result. Triggers include stress but she may awaken with these more severe headaches. Other triggers include chewing motions of her mouth.
>
> The third type of pain is located around her left TMJ with involvement of the left jaw, upper and lower teeth. It is continuous and always present (daily)

15

> with fluctuations in intensity from 5–10/10 on a pain
> scale. The pain is described as deep, burning and
> achy. This is triggered with eating, talking, wind,
> temperature of food and brushing her teeth.

Tr. 1526. Dr. Nicholas-Bublick examined Lybarger and commented that
Lybarger appeared uncomfortable in the darkened exam room. Tr. 1531. She
exhibited pain on palpation of the left supraorbital, auriculotemporal, and
greater occipital regions. Tr. 1531. Dr. Nicholas-Bublick assessed Lybarger
with "features of trigeminal neuralgia of the left side, but also of left
supraorbital and left greater occipital that when severe contributes to
migrainous headaches." Tr. 1532. She diagnosed trigeminal neuralgia,
auriculotemporal syndrome involving the left auriculotemporal nerve, and
chronic migraine. Tr. 1532. Lybarger stated that she would consider nerve
blocks and Botox injections if they would be covered by insurance, Tr. 1527, so
Dr. Nicholas-Bublick requested insurance approval for nerve blocks and Botox
injections, Tr. 1532. Given her initial response to Emgality, Lybarger wanted
to pursue an injectable calcitonin gene-related peptide, and Dr. Nicholas-
Bublick prescribed Aimovig. Tr. 1532.

In mid-December 2021, Lybarger began a course of physical therapy. Tr.
1722–23. The next day, Lybarger saw Hamilton for a follow-up. Tr. 1522. She
reported that due to the increased Lyrica dose, she was sleeping about half the
day. Tr. 1522. About a week before the appointment, she received her first
Aimovig injection. Tr. 1522. She reported "still experiencing a significant
amount of trigeminal nerve pain." Tr. 1523. Lybarger's exam findings were

16

normal. Tr. 1524. Hamilton continued Lybarger's current medications, and indicated that he would check on pending coverage for nerve blocks and message Dr. Nicholas-Bublick "for her thoughts." Tr. 1524.

In mid-January 2022, Lybarger had an endocrinology appointment and told her doctor that she experienced five migraines per month "with chronic head pain with trigeminal neuralgia." Tr. 1798.

In late February 2022, Lybarger saw Dr. Szepiela. Tr. 1585. She reported that weather changes might have increased her jaw pain. Tr. 1585. Overall, she was doing well on her current medication and physical therapy, rest, heat, Lyrica, and Norco. Tr. 1585. She also reported improvement in overall functioning. Tr. 1595. Dr. Szepiela administered a Kenalog injection and advised that Lybarger continue with her "current conservative management" including medications and a home exercise program. Tr. 1588.

In May 2022, Lybarger followed up with Dr. Szepiela for temporomandibular joint pain and fibromyalgia and reported that her symptoms were stable. Tr. 1580. She advised that the February Kenalog injection didn't help, and instead caused an intense migraine. Tr. 1580. Lybarger stated that she felt she had adjusted to Lyrica. Tr. 1580. An exam showed that Lybarger had nerve pan in her left cheek and jaw and a painful and difficult jaw range of motion. Tr. 1582. Dr. Szepiela continued her medications and referred her to a facial nerve specialist. Tr. 1583.

In June 2022, Lybarger went to the emergency room with a headache. Tr. 855. She had been without medication for two weeks because of an insurance change. Tr. 855. She experienced "pain across the left side of her face where the trigeminal neuralgia occurs" and nausea and photosensitivity. Tr. 855. Lybarger's exam findings showed that she was alert and in moderate distress due to pain. Tr. 859. She was cooperative and fully oriented with normal sensation, motor function, speech, and coordination. Tr. 859. She had no focal neurological deficits. Tr. 859. The doctor administered injections (Dilaudid and Zofran) and Lybarger's symptoms mildly improved. Tr. 860. Lybarger was discharged and planned to contact her doctor the next day about her medications. Tr. 860.

In July 2022, Lybarger saw a psychologist for another consultative psychological examination. Tr. 1737. Lybarger reported daily pain from trigeminal neuralgia, and that an attack can cause migraines. Tr. 1737. Light and sound also triggered her migraines. Tr. 1737. Lybarger could no longer drive and experienced depression from daily chronic pain. Tr. 1737. She described the activities she performed the day before the evaluation: "watched movies, read a book, took care of [her] cat." Tr. 1740. Lybarger stated that she could fold laundry and did so weekly. Tr. 1740. She used a computer about once a week to pay bills, but she sometimes forgot to pay her bills. Tr. 1741. She managed her own medications, but her boyfriend had to give her medications to her when she had a migraine. Tr. 1741.

18

In early August 2022, Lybarger followed up with Dr. Szepiela for medication management. Tr. 1575. Lybarger reported that the pain medications were working well for her and provided 75 percent pain relief. Tr. 1575. She mentioned experiencing a delay in obtaining her migraine medications, which "elevated her migraines." Tr. 1578. "Injections with [a] neurologist" were scheduled for the end of the month. Tr. 1575. Lybarger attended physical therapy once or twice per week and used a pool to help with home exercises. Tr. 1575. An exam showed left-sided face tenderness. Tr. 1577. Dr. Szepiela diagnosed Lybarger with left-sided trigeminal neuralgia; chronic migraines without aura, not intractable; and fibromyalgia. Tr. 1578.

On November 28, 2022, Dr. Nicholas-Bublick administered left-sided greater occipital and auriculotemporal nerve blocks. Tr. 1786.

On December 1, 2022, Lybarger saw Dr. Szepiela for a medication check. Tr. 1772. She told him that her Norco and Lyrica were working well. Tr. 1772. She reported difficulty with overall functioning and daily activities. Tr. 1775.

*Function reports*

In January 2021, Lybarger completed a function report. Tr. 395, 402. She wrote that medications only moderately controlled her pain and that they caused side effects, such as drowsiness, "that does not allow me to drive." Tr. 395. Bright lights, loud noises, and strong smells triggered migraines. Tr. 395. When asked to describe her daily activities, Lybarger said that she took care of necessary paperwork before taking her medications because her medications

19

made her tired. Tr. 396. She used a medication box and alarms to remind her to take her medications. Tr. 397. Some days she couldn't do anything; other days she could distract herself from pain by watching television, listening to audio books, meditating, or painting and crafting. Tr. 396. She performed light indoor chores, at times with the assistance of her boyfriend. Tr. 397. Lybarger's boyfriend was the primary caretaker of their cats, but Lybarger gave the cats food and water and let them outside or inside. Tr. 396. She helped her boyfriend take the cats to the vet and clean the litter boxes. Tr. 396. Lybarger stated that she placed online shopping orders twice a week, which took one to two hours, and was able to prepare simple meals for herself when her boyfriend was not home. Tr. 397–98. When the weather was bad, Lybarger didn't go outside unless she had a doctor's appointment because her conditions were affected by cold weather, sun, and wind. Tr. 398.

An October 2021 Disability Report form asked Lybarger to describe any changes in daily activities due to her conditions since Lybarger last communicated with the Agency. Tr. 411. Lybarger reported that in June 2021, her migraine medication became less effective and she had migraines every day. Tr. 412. Her doctors switched her to Topamax, even though it caused side effects including dizziness, drowsiness, and cognitive and speech issues. Tr. 410, 412. The doctors "were trying to figure out the right combination and correct dosing of medications to help minimize [her] pain" and she was waiting for a neurology referral for nerve blocks. Tr. 410.

A September 2022 Disability Report form asked Lybarger to describe any changes in daily activities due to her conditions since October 2021. Tr. 417. Lybarger reported that she started a new migraine medication, Aimovig, which takes three to six months to become effective. Tr. 417. She was "finally feeling the effects" of Aimovig in June 2022, when her insurance denied the medication, causing Lybarger to experience increased symptoms and visit the emergency room. Tr. 417. Lybarger restarted Aimovig in July, but she had not yet felt "the full effect of the medicine." Tr. 426. Meanwhile, her then-current medications only moderately helped and they caused side effects such as drowsiness. Tr. 426.

*State agency opinions*[3]

In January 2021, Robert Klinger, M.D., reviewed Lybarger's record. Tr. 231–40. Dr. Klinger found that Lybarger's migraines were a medically determinable impairment. Tr. 235. He considered whether Lybarger's impairments satisfied a listed impairment[4] and found that they did not. Tr.

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]     The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information

237. He considered Listings 1.15 (disorders of the spine), 2.07 ("Disturbance of Labyrinthine-Vestibular Function"), and 11.14 (peripheral neuropathy). Tr. 237. Dr. Klinger accessed Lybarger's residual functional capacity (RFC)[5] and provided exertional and environmental limitations to account for Lybarger's migraines. Tr. 239–40.

In February 2022, Leon Hughes, M.D., reviewed Lybarger's record and came to the same conclusions. Tr. 248–53.

*Hearing testimony*

Lybarger, who was represented by counsel, testified at the telephonic administrative hearing held in March 2023. Lybarger confirmed that she has a driver's license, but she chooses not to drive due to her medications. Tr. 200. She last drove in December 2020. Tr. 200. She lives in a house with her boyfriend and father. Tr. 201. Lybarger can only perform easier household chores like "light dusting" and folding laundry. Tr. 202.

Lybarger explained that during a typical day when she isn't feeling well, she will stay in bed, take her medication, and "try to hydrate." Tr. 202. This happens weekly and sometimes a couple of times a week. Tr. 214. If she feels

---

relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

[5]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

well, she will spend most of her time in her living room trying to keep her pain down and distract herself by watching television, reading books, or painting and crafting. Tr. 202. Lybarger said that she needs to be careful how much screentime or book-reading she does because these activities can cause her to have migraines. Tr. 202. She may watch something for 20 or 30 minutes and then she has to stop and rest. Tr. 209.

Lybarger normally attends physical therapy once a week, but she doesn't go in the winter because of the weather. Tr. 203. She explained that cold wind hitting her face triggers her trigeminal neuralgia. Tr. 203. At home during the winter she tries to do yoga, stretch, or meditate—"us[ing] what I learn[ed]." Tr. 203. Trigeminal neuralgia causes pain on the left side of her head and face. Tr. 204. She experiences pain in her left cheek, jaw, and teeth "that never goes away". Tr. 204. The pain can turn into "a stabbing, shooting, electric shock like pain that can sometimes drop me to my knees." Tr. 212. It can move to Lybarger's ear, temple, eyes, and forehead. Tr. 212. It can feel like drilling in her teeth, icepicks in her ears, or being shocked by a live wire. Tr. 213. Afterwards, Lybarger has "the worst toothache, earache, and headache." Tr. 213. Her trigeminal neuralgia began in 2018 after she had her wisdom teeth removed and it has become worse over time. Tr. 213. Pain medication helps with trigeminal neuralgia attacks, and a little bit with eating, but it doesn't eliminate the pain. Tr. 204.

Lybarger stated that she sees her pain management doctor about every 10 to 12 weeks. Tr. 206. She has had two rounds of nerve blocks and had a third round scheduled for the week after the hearing. Tr. 207. The first round didn't help but the second round helped. Tr. 207. The shots are painful—the doctor injects the side of Lybarger's face and head. Tr. 207. Lybarger's medication makes her drowsy, dizzy, and nauseous. Tr. 207. It also causes some cognitive problems, such as trouble concentrating, remembering, and finding words. Tr. 207. Lybarger's doctor took her off one of her medications due to the side effects, but Lybarger's headaches and migraines returned so the doctor put her back on that medication. Tr. 207.

When asked how often her "daily head pain turn[s] into more of a migraine," Lybarger answered "every other day." Tr. 209. The duration varies—a migraine can last 20 minutes or an hour. Tr. 210. Medication helps keep the migraines manageable to the point that she can avoid an emergency room visit. Tr. 210–11. But she still feels sick, and she has to lie down in a dark, quiet room and rest. Tr. 211.

The ALJ discussed with the vocational expert Lybarger's past relevant work as a bookkeeper and tax preparer. Tr. 216. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Lybarger could perform Lybarger's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 217–20, 224. The vocational

24

expert answered that such an individual could not perform Lybarger's past work but could perform the following jobs in the national economy: collator, office helper, and router. *Id.*

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.
>
> 2.  The claimant has not engaged in substantial gainful activity since August 27, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.  The claimant has the following severe impairments: cervical degenerative disc disease; migraines; trigeminal neuralgia/left temporomandibular joint arthralgia/left auriculotemporal neuralgia; fibromyalgia; chronic pain syndrome; and psychological conditions variously described as: anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, post-traumatic stress disorder (PTSD), and somatic symptom disorder (20 CFR 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: the claimant can never climb ladders, ropes, or scaffolds and can frequently climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. She can frequently reach overhead with the bilateral upper extremities. She can have occasional concentrated exposure to

extreme cold, heat, and humidity. She cannot be exposed to more than moderate noise as defined in the Dictionary of Occupational Titles. She cannot work outside but can work in lighting normally found in an office or retail store setting. She cannot work around vibrations, unprotected heights, or unprotected moving mechanical machinery. She cannot use a computer screen for more than 30 minutes at a time without a rest period of 15 minutes. She cannot perform any occupational driving. The claimant can understand, remember, and carry out simple, routine tasks but not at a production rate pace such as required working on an assembly line. She can make judgments on simple work and respond to usual work situations and occasional changes where duties are routine and predictable. She cannot perform work that requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end of day production requirements that includes remaining on task for 2-hour segments of time. She can interact appropriately with the general public, supervisors, and coworkers.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born [i]n … 1983 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

26

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 27, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. 12–41.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is

27

disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court ... asks whether" the "existing administrative record ... contains

28

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

Lybarger argues that the ALJ's step-three finding is not supported by substantial evidence "because [Lybarger's] record raised a 'substantial question' over whether her migraines medically equaled Listing 11.02 Parts B and D." Doc. 6, at 13.

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 F. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the medical equivalent of a listing[.]" *Id*. There is no heightened articulation standard at step three, *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006), but the ALJ "need[s] to actually evaluate the evidence, compare it to

30

[the relevant] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review," *Reynolds*, 424 F. App'x at 416.

"Primary headache disorder," such as migraine, "is not a listed impairment." Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019). But a primary headache disorder "alone or in combination with other impairment[s], [may] *medically equal*[] a listing." *Id*. (emphasis added). Listing 11.02, *epilepsy*, is the "most closely analogous listed impairment" for a primary headache disorder. *Id*. Listing 11.02B requires:

> dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7. And Listing 11.02D requires:

> dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked

31

limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id*. Social Security Ruling 19-4p cites Social Security Ruling 17-2p. *Id*., at *7

n.25. Social Security Ruling 17-2p, titled "Evidence needed by adjudicators …

to make findings about medical equivalence," provides:

To demonstrate the required support of a finding that an individual is disabled based on medical equivalence at step 3, the record must contain one of the following:

1. A prior administrative medical finding from an [State agency Medical Consultants] or [Psychological Consultants] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical Expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3. A report from the [Appeals Council's] medical support staff supporting the medical equivalence finding.

Soc. Sec. Ruling 17-2p, 2017 WL 3928306, at *3 (S.S.A. March 27, 2017).

Moreover, when an ALJ "believes that the evidence does not reasonably

support a finding that the individual's impairment(s) medically equals a listed

impairment," the ALJ is not required to "obtain [Medical Expert] evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.* at *4. And while an ALJ "must consider all evidence" in making an equivalency finding, the ALJ:

> is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

*Id.*

With these legal principles in mind, I consider the parties' arguments about whether the ALJ erred at step three.

The parties agree that the record contains none of the three forms of medical evidence that Social Security Ruling 17-2p requires for an ALJ to make a positive medical equivalency finding at step three. *See* Doc. 6, at 15, Doc. 9, at 3–4; *see also* Tr. 22 (ALJ's decision at step three stating that she considered, among other listings, Listing 11.02, and that "no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."). So the ALJ's no-medical-

equivalency finding was consistent with the record, and the ALJ wasn't required at step three to articulate her reasons for finding so. *See* Soc. Sec. Ruling 17-2p, 2017 WL 3928306, at *3–4; *Weese v. Comm'r of Soc. Sec.*, No. 1:22-cv-2215, 2024 WL 4213314, at *23 (N.D. Ohio Sept. 17, 2024) (no error when at step three the ALJ stated that he considered Listing 11.02, "pointed out the lack of the medical opinion evidence required by SSR 17-2p to support any medical equivalence finding," and didn't articulate further findings).

Lybarger points out that the state agency reviewers "never considered Listing 11.02 despite finding migraines to be a severe impairment." Tr. 6, at 15. But she doesn't assert that this was an error or explain how this could amount to error. In her reply brief, Lybarger complains that the ALJ "did not call a medical expert in [her] case," Doc. 9 at 4–5, but Lybarger did not raise this issue in her opening brief, so it is waived. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is waived."). Even if the Court considers Lybarger's improperly raised argument, Lybarger doesn't develop this argument. So any such argument would also be forfeited for this separate reason. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited].").

Lybarger submits that the ALJ erred at step three because she considered whether Lybarger's migraines "met" Listing 11.02. Doc. 5, at 16

(citing Tr. 22). Lybarger points out that, under Social Security Ruling 19-4p, "migraines can never meet a listing," and can only medically equal a listing. *Id*. (citing Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7). Even so, the ALJ earlier in her step-three discussion stated that Lybarger had not medically equaled any listing, including Listing 11.02. Tr. 22. The fact that the ALJ may have taken a second, unnecessary step does not affect the propriety of the ALJ's first, necessary step in determining medical equivalence.

Legal authority instructs that the balance of the ALJ's decision must supply the rationale for the ALJ's medical equivalence finding. *See* Soc. Sec. Ruling 17-2p, 2017 WL 3928306, at *4 ("An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3."); *see also Reynolds*, 424 F. App'x at 416 (an ALJ must "give an explained conclusion, in order to facilitate meaningful judicial review."); *Jandt v. Saul*, No. 1:20-cv-45, 2021 WL 467200, at *9 (W.D. Ky. Feb. 9, 2021) ("Construing SSR 17-2p in a light most consistent with the Sixth Circuit's instructions in *Reynolds*, while an [ALJ] is not required to do so at step three, he or she will provide a sufficient explanation [in the decision as a whole] for a court to determine the basis for the unfavorable finding about medical equivalence.").

In her reply brief, Lybarger resists this conclusion. Doc. 9, at 2. She contends that "the ALJ's statements within the RFC discussion cannot substitute for the more thorough analysis required at Step Three under SSR 19-4p, which arguably could have led to a disability determination that would have entirely precluded any further analysis." *Id.* at 2–3 (citing *Haines v. Comm'r of Soc. Sec.*, 5:22-cv-1161, 2023 WL 3990654, at *5 (N.D. Ohio June 14, 2023)). But in *Haines*, the issue was the ALJ's failure at step three to consider altogether whether the plaintiff's fibromyalgia medically equaled a listing. 2023 WL 3990654, at *3. Here, at step three the ALJ expressly considered Listing 11.02. Tr. 22. Even more detrimental to Lybarger's argument, the court in *Haines* did not discuss Social Security Rule 17-2p, which expressly states that an ALJ's "articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient … for the finding about medical equivalence at step 3." 2017 WL 3928306, at *4.

Lybarger eventually concedes this point—on the next page of her reply brief she admits that a court reviews "the ALJ's decision as a whole" to evaluate the ALJ's reasons for a no-medical-equivalency finding and cites *Marvich v. Comm'r of Soc. Sec.*, No. 4:23-cv-833, 2024 WL 1075465, at *15 (N.D. Ohio Mar. 12, 2024). Doc. 9, at 4. In *Marvich*, a headache-impairment case, the court considered Listing 11.02, Social Security Ruling 19-4p, and Social Security Ruling 17-2p, and concluded: "So long as the ALJ's articulation of the reasons

36

why the individual is not disabled at a later step in the sequential evaluation provides rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at Step Three, the ALJ's cursory articulation at Step Three is not error." 2024 WL 1075465, at *15.

But Lybarger doesn't challenge the ALJ's articulated rationale later in the decision. She concedes that the ALJ "did devote some space to discussing Lybarger's migraines later in the decision." Doc. 9, at 2. That's an understatement—the ALJ spent over eleven pages detailing Lybarger's migraine evidence and the ALJ's resultant conclusions. Tr. 24–36. The ALJ considered the acceptable medical sources' detailed descriptions of Lybarger's typical headache events. Tr. 29 (citing "Exhibit 22F/4," Tr. 1417 (Dr. Kriegler's note)), 30 (citing "Exhibit[] 31F/13–14," Tr. 1526–27 (Dr. Nicholas-Bublick's note)), 32 (citing "Exhibit 21F/3–5, Tr. 1410 (Physician Assistant Hamilton's note)); *see* Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7. And the ALJ discussed the frequency of Lybarger's headaches; her adherence to prescribed treatment; treatment side effects; and functional limitations. Tr. 24–36; *see* Soc. Sec. Ruling 19-4P, 2019 WL 4169635, at *7.

Lybarger doesn't challenge any of these findings. Instead, she cites evidence—much of which the ALJ cited, Tr. 24–36—and claims that she can prevail because the evidence of record "raise[s] a 'substantial question' over whether her migraines medically equaled Listing 11.02[]." Doc. 6, at 16–17;

Doc. 9, at 4. She cites in support *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641–42 (6th Cir. 2013). Doc. 6, at 14. But the "rais[ing] a substantial question" threshold in *Sheeks* applies when the ALJ didn't consider a particular listing at all, and the claimant alleges that the ALJ's failure to do so was erroneous. 544 F. App'x at 641; *Tina M. S. v. Comm'r of Soc. Sec.*, No. 1:22-cv-236, 2023 WL 2788830, at *4 (S.D. Ohio Apr. 5, 2023) ("Where an ALJ does not discuss a Listing, the Court 'must determine whether the record evidence raises a substantial question as to [a claimant's] ability to satisfy each requirement of the listing.") (citing *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014)). Because here the ALJ discussed Listing 11.02, the *Sheeks* standard doesn't apply. So Lybarger can prevail only if she shows that the ALJ's decision is unsupported by substantial evidence. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position.). Lybarger has not even attempted to do so.

In sum, Lybarger hasn't shown that the ALJ's step three evaluation violated Social Security procedural requirements or ran afoul of binding case law. She doesn't challenge the ALJ's reasoning elsewhere in the decision that supports the ALJ's medical equivalency finding. So the Commissioner's decision should be affirmed.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: December 17, 2024

        /s/ James E. Grimes Jr.
        James E. Grimes Jr.
        U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).